# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF ILLINOIS
## PEORIA DIVISION

| | | |
|---|---|---|
| KEVIN GRAHAM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.   07-cv-1284 |
| | ) | |
| TOWN OF NORMAL, | ) | |
| | ) | |
| Defendant. | ) | |

## O R D E R  &  O P I N I O N

This matter is before the Court on Defendant's Motion for Summary Judgment (Doc. 59) and Plaintiff's Motion for Partial Summary Judgment (Doc. 61). Also pending is Defendant's Motion to Strike Plaintiff's Additional Statement of Facts and Exhibit 16 Voicemail Message. (Doc. 72). For the reasons stated below, Defendant's Motion for Summary Judgment is granted in part and denied in part, Plaintiff's Motion for Summary Judgment is denied, and Defendant's Motion to Strike is denied.

### LEGAL STANDARD

Summary judgment should be granted where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In ruling on a motion for summary judgment, the court must view the evidence on record in the light most favorable to the non-moving party. SMS Demag Aktiengesellschaft v. Material Sciences Corp., 565 F.3d 365, 368 (7th Cir. 2009). All inferences drawn from the facts must be construed in

favor of the non-movant; however, the court is not required to draw every conceivable inference from the record. <u>Smith v. Hope School</u>, 560 F.3d 694, 699 (7th Cir. 2009). The court draws only reasonable inferences. <u>Id.</u>

It is not the court's function to scour the record in search of evidence to defeat a motion for summary judgment. Instead, the court relies on the non-moving party to identify the evidence which creates an issue of triable fact. <u>Cracco v. Vitran Exp., Inc.</u>, 559 F.3d 625, 632 (7th Cir. 2009) (<u>quoting</u> <u>Greer v. Bd. of Educ.</u>, 267 F.3d 723, 727 (7th Cir. 2001). If the evidence on record could not lead a reasonable jury to find for the non-movant, then no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. <u>McClendon v. Indiana Sugars, Inc.</u>, 108 F.3d 789, 796 (7th Cir. 1997). At the summary judgment stage, however, the court may not resolve issues of fact; disputed material facts must be left for resolution at trial. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249-50 (1986).

## BACKGROUND[1]

Plaintiff Kevin Graham, who is African-American, worked at the Ironwood Golf Course ("Ironwood"), which is operated by the Town of Normal Parks and Recreation Department, from 1996 to 2005 as a seasonal employee during the "golf season."[2] In August 2005, several months before the end of the golf season, Plaintiff quit his job at Ironwood, giving two-weeks' notice, because he thought that

---

[1]    These relevant background facts are drawn from the parties' respective statements of material facts. Where the facts are disputed, this is noted. All reasonable inferences have been drawn in favor of the non-movant.

[2]    This season has been described as "spring until snowfall" by Plaintiff, and lasted approximately eight months out of the year. (Graham Dep. at 27).

Ironwood was about to terminate his friend, Mark Saltsberg.  When quitting, Plaintiff asked whether he was eligible to be rehired, and was informed by Doug Wiggs, Assistant Director of Parks and Recreation, that he was.

While Plaintiff worked at Ironwood, Wiggs had received reports from Saltsberg, the Supervisor of Ironwood until 2005, that patrons had complained about Plaintiff's behavior, including verbal confrontations with a season-pass holder and an elderly golfer.  In addition, Wiggs was told that Plaintiff had had confrontations with co-workers whom Plaintiff believed needed to work harder.  However, Saltsberg also testified that Plaintiff's work was "satisfactory."  In November 2005, Saltsberg was told by Tod Anderson that Wiggs had, in a private conversation with Anderson, referred to Plaintiff as a "dumb nigger."  Plaintiff did not hear the alleged comment himself, and learned about it well after his departure from the golf course in 2005, but before June 2007.  Defendant acknowledges that members of the Town and Ironwood administration knew that such a statement had been alleged.

On January 15, 2006, Plaintiff applied for a position at Ironwood, and was not called for an interview.  Garry Little, Director of Parks and Recreation, testified that Plaintiff was not rehired in 2006 because he had quit mid-season in 2005.  Another former employee was not hired in 2006, John Puckett.[3]  Puckett, who is

---

[3]   Defendant asserts that all of Plaintiff's submitted evidence relating to John Puckett is "irrelevant and prejudicial and should be stricken."  (Doc. 72 at 2).  The Court does not agree that this is the case, as one category of circumstantial evidence that may be considered by the Court in Title VII cases is "evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment."  Darchak v. City of Chicago Bd. of Educ., 580 F.3d 622, 631 (7th Cir. 2009).  As discussed below, whether an item of evidence

African-American, along with Thomas Moberly, who is white, was the subject of an investigation of a claim of sexual harassment in 2005 by a female Ironwood employee; Mark Peterson, Normal's City Manager determined that insufficient evidence had been presented to support the claim.  Though Puckett was not rehired in 2006, Moberly was.

Plaintiff claimed that Defendant's failure to rehire him in 2006 was the result of discrimination.  On June 23, 2006, Jose Garibay, Defendant's Human Resources Director, investigated Plaintiff's claim, and found an insufficient basis to conclude that discrimination or retaliation had influenced the decision not to hire Plaintiff in 2006.[4]  On August 25, 2006, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC").  In this Charge, Plaintiff claimed that he had not been interviewed by Ironwood in 2006 because of discrimination based on his race, and in retaliation for his participation in the investigation of sexual harassment claims against Puckett.  On October 16, 2006, Plaintiff and Defendant signed a Settlement Agreement disposing of Plaintiff's 2006 EEOC claims.  In this Settlement Agreement,[5] Plaintiff agreed not to institute a

---

is "prejudicial" is not important to the discussion -- most evidence that is asserted by the opposing party in litigation will by prejudicial to one's position.  In addition, the "undue prejudice" standard is primarily for the protection of a jury, and the Court can itself weigh whether a  given piece of evidence is "unduly prejudicial" when considering it.

The evidence relating to Puckett is not relevant to Plaintiff's retaliation claim, as Plaintiff does not assert in his Statement of Additional Facts or in his Response that Puckett also engaged in statutorily protected activity prior to Defendant's decision not to rehire him.

4       Garibay's Memorandum was submitted as Plaintiff's Exhibit 9.

5       This Settlement Agreement was submitted as Plaintiff's Exhibit 5.

suit under Title VII against Defendant, while Defendant agreed (1) "to offer to host the Western Avenue Community Youth Golf Program in the 2007 season in a similar fashion as the group was hosted…in the 2005 Golf Season, or to offer a program similar to First Tec., Inc.;" (2) "to give [Plaintiff] a Frequent Player Card for the 2007 Golf Season," (3) "to implement a Diversity Training Program for all supervisors of the Normal Parks and Recreation Department within 12 months of the signing of this Agreement;" and (4) that Plaintiff was "free to apply for a seasonal position with [Ironwood] and will be guaranteed a job interview for the 2007 Golf Season," but Plaintiff was "not, however, guaranteed a job but only that his job application will be treated objectively and fairly like any other job applicant." It was agreed in the Settlement Agreement that Defendant did not admit any violation of Title VII.

In January 2007, Plaintiff applied for a position at Ironwood.  On June 4, 2007, Plaintiff had a scheduled interview at Ironwood.  When he arrived at the interview, Wiggs was present with Craig Onsrud, Ironwood's Supervisor, in contradiction to Defendant's usual practice.  Plaintiff testified that Onsrud and Wiggs told him that they had questions for him, and that Wiggs brought a written list of questions for Plaintiff.  Little testified that Wiggs was present in order to ensure that the interview complied with the terms of the Settlement Agreement. Plaintiff inquired as to whether his was the only interview that Wiggs attended, and was informed that his was the only one.  Plaintiff then told Onsrud and Wiggs that the interview was over and that he would only be interviewed with his attorney present.  The interview was never rescheduled.

Onsrud was in charge of hiring seasonal employees for Ironwood in 2007, and no one instructed Onsrud as to whether Plaintiff should be hired. Onsrud testified that he required applications and interviews from all potential employees for the 2007 season, but later noted that he did not remember receiving applications from several people rehired from previous years in 2007.

On June 8, 2007, Plaintiff filed a Charge of Discrimination with the EEOC, alleging that Defendant had retaliated against him because of his 2006 EEOC Charge and had discriminated against him on the basis of his race. On October 19, 2007, Plaintiff filed the instant suit, alleging race discrimination and retaliation in violation of Title VII, and breach of the 2006 Settlement Agreement.

## DISCUSSION

### I.   Count I: Race Discrimination

Defendant's Motion for Summary Judgment argues that summary judgment should be granted in its favor on Counts I and III of Plaintiff's Second Amended Complaint ("Complaint"), which allege race discrimination and retaliation in violation of Title VII. Plaintiff has filed his Response in opposition to Defendant's Motion for Summary Judgment, and Defendant has filed a Reply.

Plaintiff's Complaint alleges that Defendant discriminated against him on the basis of his race by refusing to hire him in 2007, and/or by subjecting him to "different selection procedures as compared to other non-Black individuals." (Doc. 27 at 3). However, throughout his Response, Plaintiff argues that the "adverse employment action" that he complains was motivated by discrimination is Defendant's failure to hire him in 2007. (Doc. 68 at 14, 20). Therefore, the Court

will rely on Plaintiff's Response in assuming that Plaintiff now claims that only "failure to hire" supports his race discrimination claim.[6]  Plaintiff does appear to argue that the "different selection procedure" is circumstantial evidence of discriminatory motive, and the Court considers it for that purpose.

Title VII discrimination plaintiffs can proceed under either an indirect or a direct method of proof.   Under the indirect method, articulated by the Supreme Court in McDonnell Douglas Corp. v. Green, a plaintiff must first show a prima facie case: "(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications."  411 U.S. 792, 802 (1973).  The final element can also be more generally stated by saying "similarly-situated persons not in the protected class were treated more favorably."  McGowan v. Deere & Co., 581 F.3d 575, 579

---

[6]        Further, even if the Court were to consider the "different selection process" as part of the discrimination claim, the alleged "different selection process" is insufficient to constitute an "adverse employment action" as required for discrimination claims.  See Herrnreiter v. Chicago Housing Authority, 315 F.3d 742, 744 (7th Cir. 2002).  As discussed further below, the only "difference" in Plaintiff's hiring process was that Wiggs was to be present during his interview, which he argues was intimidating.  The Seventh Circuit has divided the types of actions that are qualifying "adverse employment actions" into three categories: (1) diminution in "compensation, fringe benefits, or other financial terms of employment;" (2) job change or transfer that "reduces the employee's career prospects by preventing him from using the skills in which he is trained and experienced;" and (3) changes in conditions of work that create "a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in his workplace environment."  Id.  The latter category includes constructive discharge and harassment.  Plaintiff has cited no cases holding that an allegedly intimidating interview was an "adverse employment action," and the Court finds that it fits none of the recognized categories.

(7th Cir. 2009) (<u>citing</u> <u>Fane v. Locke Reynolds, LLP</u>, 480 F.3d 534, 538 (7th Cir.2007)).  After the plaintiff makes out his prima facie case, the burden shifts to the employer to state a legitimate, non-discriminatory reason for the adverse action, which the employee must then show to be false and merely a pretext for discrimination.  <u>McGowan</u>, 581 F.3d at 579.  "The pretext analysis focuses on whether the reason was honest and not whether it was accurate or wise."  <u>Id</u>. (<u>citing</u> <u>Barricks v. Eli Lilly & Co.</u>, 481 F.3d 556, 560 (7th Cir.2007)).  The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against him remains with the plaintiff.  <u>Id</u>.

To survive summary judgment under the direct method of proof, a plaintiff must show "triable issues as to whether discrimination motivated the adverse employment action," using either direct or circumstantial evidence.  <u>Nagle v. Village of Calumet Park</u>, 554 F.3d 1106, 1114 (7th Cir. 2009) (<u>citing</u> <u>Lewis v. Sch. Dist. # 70</u>, 523 F.3d 730, 741 (7th Cir. 2008)).  As direct "evidence usually requires an admission from the decisionmaker about his discriminatory animus," most plaintiffs use circumstantial evidence.  <u>Id</u>.

Defendant assumes in its Motion for Summary Judgment that Plaintiff proceeds only under the indirect method.  Though Plaintiff's Response is not a model of clarity, it appears that Plaintiff is arguing that his claim should survive summary judgment under either method of proof.  This is so because Plaintiff discusses the prima facie case that is required under the indirect method, but also cites to an alleged "convincing mosaic of circumstantial evidence that allows to jury to infer intentional discrimination," which is the language of the direct method of

proof.  (Doc. 68 at 14, 25 (citing Phelan v. Cook County, 463 F.3d 773, 779-80 (7th Cir. 2006)).  Therefore, Plaintiff's case will be analyzed under both methods of proof.

## A.      Indirect Method of Proof

Plaintiff's claim of race discrimination fails under the indirect method of proof.  Defendant argues that Plaintiff has failed to produce evidence of the last "three of the four" elements of the indirect prima facie case.  (Doc. 62 at 6).  It claims that Plaintiff did not suffer an "adverse employment action" under Zhivanovich v. Unisys Corp., because he voluntarily left the scheduled interview before it was conducted.  1998 WL 852959 (N.D. Ill. 1998).  It also claims that Plaintiff's refusal to be interviewed disqualified him from consideration for the position, that Plaintiff was not qualified for the position in any event because he had quit in 2005, and that Plaintiff's supervisors had previously received complaints about his interactions with the public.  Further, in its Reply, Defendant clarifies its allusion to a third missing element by arguing that Plaintiff has shown no evidence that a "similarly situated" person, "one that did not complete scheduled interviews and had previously quit the position," was treated better than he.  Finally, Defendant argues that, even if Plaintiff has made out a prima facie case, it has legitimate, non-discriminatory reasons for its treatment of Plaintiff.

As the Seventh Circuit has pointed out, "[t]he prima facie case and pretext analyses often overlap, so we have said that we can proceed directly to the pretext inquiry if the defendant offers a nondiscriminatory reason for its action."  Scruggs v. Garst Seed Co., 587 F.3d 832, 838 (7th Cir. 2009) (citing Adelman-Reyes v. St. Xavier Univ., 500 F.3d 662, 665 (7th Cir. 2007)).  Therefore, the Court will assume

without deciding that Plaintiff could make out his prima facie case under the indirect method, and will proceed to the analysis of whether Defendant's given reasons were pretextual.

After articulating a legitimate, non-discriminatory reason for its action, Defendant's "burden is…quite light; the employer need not persuade the court that he was actually motivated by the reason he gives and the mere articulation of the reason rebuts the prima facie case and puts the onus back on the plaintiff to prove pretext." Pilditch v. Board of Educ. of City of Chicago, 3 F.3d 1113, 1117 (7th Cir. 1993) (citing Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254-56 (1981)). "To establish pretext, [Plaintiff] must show that his race was the determining factor…, or that but for his race he would [not have experienced the adverse action]….[He] must produce significantly probative admissible evidence from which the trier of fact could infer that the employer's reason was false *and* that the actual reason was discriminatory." Jones v. Union Pacific R. Co., 302 F.3d 735, 742-43 (7th Cir. 2002) (internal quotations and citations omitted) (emphasis in original).

Defendant articulates three reasons for its failure to hire Plaintiff for the 2007 season: (1) Plaintiff's 2005 mid-season resignation raised questions about his reliability,[7] (2) Plaintiff walked out of his 2007 interview, and (3) Defendants had received complaints about Plaintiff from customers and co-workers during the time that he was previously employed at Ironwood.

---

[7]    Again, it should be noted that Plaintiff quit in 2005 because he believed that Saltsberg was about to be fired, not because he had any complaint about discrimination.  (Graham Dep. at 66, 72, 83-84)

Plaintiff does not address the first given reason in his Response, and puts on no evidence to show that Defendant was not concerned about his reliability when considering him for the 2007 season.  Indeed, Defendant has offered evidence that it had also not rehired Plaintiff in 2006 because he had quit in 2005.[8]  (Little Dep. at 26-28).  These assertions have been unrebutted by Plaintiff.[9]  As noted above, the

---

[8]     As noted above, the Settlement Agreement, which dealt with Defendant's refusal to hire Plaintiff in 2006, expressly provides that Defendant did not admit to any discrimination or retaliation against Plaintiff in not hiring him for 2006.  There are many reasons that parties who are innocent will settle claims made against them, and the Court cannot presume from the fact of settlement that Defendant acted wrongfully in not hiring Plaintiff in 2006.

[9]     Though not placed in the Argument section of his Response, Plaintiff makes three arguments in his responses to Defendant's asserted material facts.  In the interest of thoroughness, the Court will consider these arguments, though they should have been placed in the Argument section of Plaintiff's Response, not within his responses to Defendant's asserted material facts, and though it is not clear that they are intended to show that Defendant's given reason is pretextual.
   First, Plaintiff testified that Wiggs told him when he quit in 2005 that he was eligible to be rehired.  (Doc. 68 at 5).  Even if Wiggs told him this, it is not a reasonable inference that merely stating that Plaintiff was "eligible" to be rehired is the same as saying that he would be rehired, or that his mid-season resignation would not be considered as a factor in deciding whether he would be rehired.  Further, the fact that Wiggs believed Plaintiff to be "eligible" to be rehired does not show that Onsrud, whom the unrebutted testimony shows to have been in charge of hiring, would believe his 2005 mid-season resignation to be unimportant.
   Second, Plaintiff argues against Defendant's assertion that Ironwood was short-staffed in 2005 after his departure.  (Doc. 68 at 5-6).  However, his citation to Exhibit 13 does not support the claim.  In addition, whether Ironwood was short-staffed is ultimately irrelevant to the question of whether the reason is pretextual, as an employer is entitled to doubt an employee's reliability after he quits even if his departure does not leave the employer shorthanded.
   Finally, to the extent that Plaintiff attempts to use the fact that he had more experience than those hired for 2007 to argue that the reason was pretextual, he does not succeed.  Even if he had the most experience of the applicant pool, Title VII does not require employers to make employment decisions based on seniority.  See Hall v. Forest River, Inc., 536 F.3d 615, 620 (7th Cir. 2008).  Further, even if he had more experience, he has not shown that the other members of the applicant pool who were hired also quit mid-season in previous years of employment with Defendant, demonstrating unreliability.

11

pretext analysis focuses on the honesty of Defendant's asserted reason, not on whether Defendant's perception of unreliability was accurate or whether it was wise to draw the conclusion of unreliability on the basis of Plaintiff's prior resignation. Plaintiff has presented no evidence to carry his burden of proving that the "reason was false *and* that the actual reason was discriminatory." Jones, 302 F.3d at 742-43. As the Court has found that Defendant's first given reason is not pretextual, there is no need to evaluate the other reasons given. Plaintiff's claim of race discrimination because of Defendant's failure to hire him in 2007 fails under the indirect method of proof.

### B.      Direct Method of Proof

Plaintiff's claim of race discrimination fails under the direct method of proof. Plaintiff has shown, on his claim of discriminatory failure to hire, that he was subjected to a "materially adverse employment action."[10]  Phelan, 463 F.3d at 780. As noted above, when relying on the direct method, plaintiffs may construct a "convincing mosaic of circumstantial evidence that allows a jury to infer intentional

---

[10]      Defendant argues that Plaintiff was not subjected to a materially adverse employment action, as he voluntarily left the scheduled interview before it was conducted.  In support, Defendant cites to Zhivanovich v. Unisys Corp., 1998 WL 852959 (N.D. Ill. 1998). This case is inapposite here, though. The Northern District of Illinois held there that the plaintiff could not establish a prima facie case where he walked out of and did not reschedule a scheduled interview at a staffing agency because the interviewer was too busy, and because there was no evidence that the defendant, Unisys, actually made any decision with regard to the plaintiff (it appeared that only the staffing agency made any decision, and it was not a defendant).  Further, the court also held that the plaintiff had no evidence that the given reason for postponement of the interview, that the interviewer was too busy, was pretextual.  Given these myriad reasons for the Zhivanovich court's decision, this Court will not rely on the fact that Plaintiff left the interview to conclude that he did not suffer an adverse employment action.

discrimination by the decisionmaker."[11]  Id. at 779-80 (quoting Rhodes v. Ill. Dep't of Transp., 359 F.3d 498, 504 (7th Cir. 2004)).  This "convincing mosaic" can be made up of three types of circumstantial evidence:

> (1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; and (3) evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination.[12]

Darchak v. City of Chicago Bd. of Educ., 580 F.3d 622, 631 (7th Cir. 2009) (citing Sun v. Bd. of Trustees, 473 F.3d 799, 812 (7th Cir. 2007); Troupe v. May Dep't Stores, Inc., 20 F.3d 734, 736 (7th Cir. 1994)).  Again, the Court notes that Plaintiff's Response is not well-organized.  However, the Court has tried to piece together Plaintiff's argument from the disarray.

Under the first category of circumstantial evidence, Plaintiff presents several arguments relating to himself.  Plaintiff's first argument under the direct method is that the fact that Wiggs was present at his scheduled interview circumstantially shows that Defendant intentionally discriminated against him on the basis of his race by placing a person "known" to have used a racial slur in reference to Plaintiff in the interview.[13]  As noted above, in 2005, after Plaintiff had resigned from

---

[11]    Plaintiff may also rely on direct evidence, but he concedes that he lacks such direct evidence.  (Doc. 68 at 25).

[12]    Any evidence of pretext, the third category, has already been discussed in the Court's analysis under the indirect method of proof.

[13]    Plaintiff relies in part on a bizarre analogy to a hypothetical company that planned diversity training in which employees dressed up in Klan outfits or

Ironwood for other reasons, Tod Anderson informed Saltsberg that Wiggs had referred to Plaintiff as a "dumb nigger" in a private conversation between Wiggs and Anderson; no others heard the alleged statement.[14]  The fact that Defendant's supervisory employees may have known that the statement had been alleged against Wiggs does not show prohibited animus.  Defendant was entitled to rely on the report of its Human Resources director, which reasonably found that the

---

blackface makeup, then accidentally scheduled an interview on that day with an African-American prospective employee, to which the interviewers showed up in their previously-donned costumes.  Plaintiff argues that this circumstance would excuse the interviewee from participating in the interview, and that the employer would have to show that diversity training was indeed occurring on the day in question in order to establish that it had a legitimate, non-discriminatory reason for the offensive apparel.  The Court has strained to understand the purported application of this analogy to this case, and can only determine that Plaintiff believes that, as Defendant allegedly has no good reason for having Wiggs (whom the Court assumes is alleged to wear figurative blackface makeup by virtue of his alleged previous use of a racial epithet in regard to Plaintiff) sit in on his interview, the Court must find that his presence indicates a showing of racial animosity designed to intimidate Plaintiff into withdrawing from the interview.  Alternatively, Plaintiff appears to argue that it was retaliatory, as Wiggs, allegedly in figurative blackface makeup, was present in order to punish him for his previous charges against Defendant.

[14]   The only evidence of this statement presented by Plaintiff comes from Saltsberg's deposition, in which he testified that Anderson told him of it.  (Saltsberg Dep. at 90-93).  Anderson was not deposed.  Though Defendant has not objected to it, Saltsberg's testimony on this point is inadmissible hearsay when offered to prove that Wiggs made the statement, as Saltsberg only knows that Wiggs made the statement because he was told of it by Anderson.  Gunville v. Walker, 583 F.3d 979, 985 (7th Cir. 2009) (collecting cases holding that hearsay is inadmissible at summary judgment).  If offered for that purpose, the testimony would be hearsay.  Anderson (or Wiggs) would be the proper person to testify as to the statement, not Saltsberg.

However, the Court will construe the offer of Saltsberg's testimony, as well as of Garibay's report, as an effort to show, not that the statement was made, but that Defendant's supervisory employees knew of the allegation by Anderson when they sent Wiggs to monitor Plaintiff's interview.

allegation was inconclusive, and to continue to have him perform duties that he otherwise would have performed.

Plaintiff also argues that Garibay's report of his 2006 investigation into Plaintiff's claims of discrimination shows that Defendant condoned racial discrimination. The Court does not agree. Garibay's report shows that he carefully looked into each of Plaintiff's allegations, and it reasonably addresses of each Plaintiff's allegations of racial discrimination. Garibay's report does not reasonably raise the inference that Defendant condoned racial discrimination nor that Defendant discriminated against Plaintiff.

Plaintiff argues that Wiggs harbored racial animosity against him that infected the hiring process. Defendant has put on evidence that only Onsrud made hiring decisions for the position that Plaintiff sought, and that no one told Onsrud whether or not to hire Plaintiff. (Little Dep. at 11-12, 14; Onsrud Dep. at 19-20). Plaintiff has put on no evidence that Onsrud discriminated against him, and indeed admitted that Onsrud did not. (Graham Dep. at 125-26). Therefore, it would appear that Wiggs' alleged personal racial animosity had no effect on whether Defendant hired Plaintiff. In an attempt to show that Wiggs' alleged racial animosity is attributable to Onsrud and thus to Defendant, Plaintiff puts forward a "cat's paw" theory. Under this theory, Plaintiff would have to show that some person who wanted to intentionally discriminate against him had "singular influence" over the employment decision. "For a nominal non-decision-maker's influence to put an employer in violation of Title VII, the employee must possess so much influence as to basically be herself the true "functional[ ]…decision-maker."

Brewer v. Board of Trustees of University of Ill., 479 F.3d 908, 917 (7th Cir. 2007)

(quoting Little v. Ill. Dept. of Revenue, 369 F.3d 1007, 1015 (7th Cir.2004)).

In order for this theory to be relevant, though, Plaintiff first has to show that Wiggs or someone else with influence over the hiring process intended that he not be rehired, *because of his race*.  Here, Plaintiff has shown no evidence that Wiggs or anyone else who might have influenced the decision not to hire him was biased against his employment because of his race.[15]  Plaintiff's submission of Saltsberg's

---

[15]    Plaintiff presents his suspicion that the requirement that police officers be present during the rental of a Town clubhouse by a black fraternity in 2004 was evidence of Wiggs' and Little's racial animus, as this was the only group for whom such a requirement was made.  (Doc. 68 at 12 (citing Graham Dep. at 179-80)). However, even if this requirement does show that Wiggs and Little harbored feelings of racial animus in general, it does not suggest a causal link between the animus and Defendant's decision not to rehire Plaintiff.  The necessity of a causal link is why the three categories of circumstantial evidence set out by the Seventh Circuit all relate to employment, not merely to racist beliefs in general.  In relying on behavior or comments toward racial minorities to show circumstantial evidence, Plaintiff has to show that these were "directed at other *employees* in the protected group."  Darchak, 580 F.3d at 631 (emphasis added).
       Plaintiff also points to several pieces of evidence that he believes supports the theory that Little harbored racial animosity that infected the hiring process.  (Doc. 68 at 11 (citing Puckett Dep. at 104-06; Graham Dep. at 162-63; Saltsberg Dep. at 91-93; Pl.'s Ex. 19 at 4-20)).
       The first point is an alleged statement by Little to Saltsberg.  Only Puckett's testimony is on-point.  Puckett appears to have testified that *he heard that Little said* that Saltsberg was "turning [Ironwood] into a black course," and "are these the people that we want representing us," which he interpreted as a reference to African-American employees.  However, Puckett had never himself heard Little say anything that was discriminatory.  (Puckett Dep. at 106).  This testimony is inadmissible hearsay, which cannot be considered at summary judgment.  Gunville, 583 F.3d at 985.  Puckett's testimony that he heard about Little's supposed statements is hearsay because Plaintiff offers it to prove that Little said these things, and because Puckett only knows of the statements because someone else told him, not because he heard Little say them.  Therefore, this piece of evidence cannot be used to defeat summary judgment.
       The second point is the "Little…strongly objected to the rental of a Town pool by a black fraternity."  (Doc. 68 at 11).  However, none of the cited evidentiary references mention the rental of a Town pool.  It is the non-moving party's duty to

16

testimony that Anderson told him that Wiggs used a racial epithet in referring to Plaintiff is not probative here, because, as discussed above at footnote 14, this testimony is inadmissible hearsay when used to show that Wiggs actually made the statement.

Even if the Court were to consider this testimony for the proposition that Wiggs actually made the statement, it is uncontroverted that it was an isolated incident in a private conversation, and Plaintiff has put on no other evidence of Wiggs' alleged racial animus to show that any alleged "influence" that Wiggs had over the decision not to hire Plaintiff was racially motivated. Typically, a single remark is insufficient to show that an adverse employment action is the result of discriminatory animus. Merillat v. Metal Spinners, Inc., 470 F.3d 685, 694 (7th Cir. 2006). This changes, though, "when those remarks are made by the decision-maker or one having input in a decision, and are made '(1) around the time of, *and* (2) in reference to, the adverse employment action complained of.'" Id. (quoting Hunt v. City of Markham, Illinois, 219 F.3d 649, 652-53 (7th Cir. 2000) (emphasis added));

---

present *evidence*, not merely argument or unsupported allegations, that shows that summary judgment should be denied. It is not the Court's duty to scour the record to find evidence to support Plaintiff's assertions. Cracco, 559 F.3d at 632 (quoting Greer, 267 F.3d at 727 ("Employment discrimination cases are extremely fact-intensive, and neither appellate courts nor district courts are obliged in our adversary system to scour the record looking for factual disputes.")). Here, the Court, in considering arguments made in Plaintiff's responses to Defendant's asserted facts, rather than properly presented in the Argument section of Plaintiff's Response, has already given Plaintiff far more leeway than is required. The Court will not search through each deposition in an effort to find evidence that support's Plaintiff's theory, but relies on Plaintiff's particular citations as required by Local Rule 7.1(D)(2)(b). Further, as noted in regard to the rental of the town clubhouse, only treatment of other *employees* is relevant circumstantial evidence under Seventh Circuit case law.

see also Hemsworth v. Quotesmith.com, Inc., 476 F.3d 487, 491 (7th Cir. 2007). Even if Wiggs used this racial slur in reference to Plaintiff, the statement was made more than one and a half years prior to the decision not to hire him in 2007 and was not in reference to any employment decision affecting Plaintiff. Finally, Plaintiff has put on no evidence that Onsrud's decision was in fact influenced by Wiggs or anyone else.[16]

Under the second category of evidence, Plaintiff argues that he noticed a decrease in minority workers after Little took over the Director of Parks and Recreation position. As noted above, for this evidence to be relevant, Plaintiff would have to show, though not statistically, that non-black employees received "systematically better treatment" than did black employees. Instead, he testified that he "believed" that before Little arrived, African-American interns used to work at Ironwood, but that after Little came, Plaintiff saw only one African-American intern. (Graham Dep. at 162-63). Plaintiff does not state whether the intern program continued at all, or whether only African-American interns were excluded. Further, he notes that he and Puckett were the only African-Americans at Parks and Recreation who held management positions. Not knowing how many management positions there were in the department, or whether other minority

---

[16]    Plaintiff argues that Wiggs withheld information from Onsrud that was relevant to the hiring decision, such as the facts that Wiggs told Plaintiff in 2005 that he was "eligible" to be rehired after his resignation and that Wiggs had been alleged to have used a racial slur in reference to Plaintiff. However, such an unsupported allegation is not sufficient to carry Plaintiff's burden of raising a genuine issue of material fact that Wiggs actually "suppl[ied] misinformation or fail[ed] to provide relevant information to the person making the employment decision." Brewer, 479 F.3d at 917. In addition, the potential relevance of these two pieces of information to the hiring decision is also doubtful.

candidates had sought management positions, the import of this testimony is unclear. These two anecdotal observations, even if true, are insufficient to show "systematically better treatment" of non-minority employees.

Plaintiff also presents some argument that the treatment of John Puckett by Defendant is relevant circumstantial evidence to show Defendant's racial animosity and discrimination. Whether evidence of the treatment of other employees is "relevant depends on a variety of factors, including 'how closely related the evidence is to the plaintiff's circumstances and theory of the case.'" Hasan v. Foley & Lardner LLP, 552 F.3d 520, 529 (7th Cir. 2008) (quoting Sprint/United Mgmt. Co. v. Mendelsohn, 128 S.Ct. 1140, 1147 (2008)).

Puckett, who is African-American, along with Moberly, who is white, was the subject of an investigation of a claim of sexual harassment in 2005 by a female Ironwood employee. Mark Peterson, City Manager, determined that insufficient evidence had been presented on the claim. Thereafter, Puckett was not rehired in 2006, while Moberly was. It appears that, if Puckett and Moberly were similarly situated in other respects, Puckett may have a prima facie case of unlawful discrimination.[17] However, Puckett's situation is not closely related to Plaintiff's circumstances: Puckett did not quit mid-season, as did Plaintiff, so the circumstances regarding whether Defendant wrongfully refused to hire Puckett are distinguishable from the instant case.

---

[17]   This statement is not intended to be determinative of Puckett's rights or to have any legal effect with regard to him; it is merely made in order to move forward with the analysis of Plaintiff's case.

As the Court has discussed, no single piece of evidence that Plaintiff has put on as part of his attempt to create a "convincing mosaic" of circumstantial evidence is sufficient to withstand summary judgment. Likewise, they are insufficient when viewed together. Even if he has shown, which is doubtful, that some members of Ironwood's administration harbored some racial animus, he has not linked that alleged animus to the decision not to hire him for 2007 -- a "causal link" must be demonstrated. Ptasznik v. St. Joseph Hosp., 464 F.3d 691, 695 (7th Cir. 2006) ("circumstantial evidence must point directly to a discriminatory reason for the termination decision") (citing Cerutti v. BASF Corp., 349 F.3d 1055, 1063 (7th Cir. 2003). The only piece of evidence that the Court considers potentially relevant to showing a causal connection is the treatment of Puckett. However, this single piece of evidence, unrelated to Plaintiff's case, is insufficient to create the "convincing mosaic" of circumstantial evidence that points directly to a discriminatory reason required to withstand summary judgment.

Unlike the plaintiff in Hasan, who showed multiple racially derogatory remarks by a law firm partner one year prior to his termination, that his work was reduced shortly following the comments, that the partner participated in the partners' decision to fire him, and that the partner incited "racially charged commentary from other partners," Plaintiff here has not shown sufficient circumstantial evidence that the alleged animus of Wiggs and/or Little had any effect on Defendant's decision not to rehire him in 2007. 552 F.3d at 528. Similarly, the plaintiffs in Paz v. Wauconda Healthcare and Rehabilitation Centre, LLC and Phelan provided significantly more damning evidence against their employers. Paz,

20

a Mexican-American, showed with admissible evidence that her supervisor made derogatory comments about Mexican-Americans within two months of firing her, and that multiple Hispanic employees were treated less favorably "with regard to job duties, breaks, and shift assignments." Paz v. Wauconda Healthcare and Rehabilitation Centre, LLC, 464 F.3d 659, 666 (7th Cir. 2006). Phelan, who was female, introduced evidence that she was body-slammed into a desk by two men, repeatedly placed in a headlock by another, told that her workplace was "no place for a woman," insulted when she complained, and prevented from taking medical leave to recuperate from being assaulted at work. Phelan, 463 F.3d at 782.

For the foregoing reasons, summary judgment on Plaintiff's Count I, alleging racial discrimination in violation of Title VII, is granted in favor of Defendant.

## II.    Count III: Retaliation

Plaintiff's Complaint also alleged that Defendant retaliated against him for his previous filing of racial discrimination charges against it by failing to hire him and by

> conspiring to subject Plaintiff to different selection procedures designed to intimidate and interfere with his employment efforts including delaying his interview without good cause and intentionally assigning a person to participate in Mr. Graham's interview that was known by Mr. Graham and numerous persons in supervisory authority at [Defendant] to have previously made racially intimidating remarks against Plaintiff.

(Doc. 27 at 4-5). Defendant appears to proceed under the assumption that Plaintiff only complains of its refusal to hire him for the 2007 season. However, Plaintiff's Complaint clearly states that he also complains of its subjecting him to "different selection procedures." (Doc. 27 at 4-5). His Response to the Motion for Summary

Judgment bears this out.  The only "different selection procedure" to which Plaintiff was subjected was having Wiggs present during his scheduled interview.[18]

Title VII prohibits retaliation against an employee who has "opposed any practice" made unlawful by Title VII or who "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII.  42 U.S.C. § 2000e-3(a).  Here, Plaintiff has previously filed Charges against Defendant with the EEOC, and Defendant does not dispute that these Charges suffice to place Plaintiff within the scope of Title VII's retaliation provision.  A retaliation plaintiff can proceed under either an indirect or direct method of proof, just as can a discrimination plaintiff.  Scruggs v. Garst Seed Co., 587 F.3d 832, 838 (7th Cir. 2009).  As noted in the Court's discussion of Plaintiff's discrimination

---

18   Plaintiff has attempted to argue for other "differences" between his process and that of other applicants who had not engaged in protected activity: his having to submit a written application and undergo an interview, though some rehired employees did not have to do so, and that his interview was delayed.  Neither of these are true differences, however.

At least some 2007 rehire applicants both submitted written applications and underwent interviews, as shown by the notations on Plaintiff's Exhibit 13.  (Pltf's Ex. 13, applications of: Woodall, Lewis, Moberly, Brown).  It appears from the evidence that Defendant used a range of hiring processes; Plaintiff cannot argue that he should have been evaluated under the "easiest" one, so long as the process was fair and not tainted by retaliation.  Indeed, the Settlement Agreement required both an application and an interview, not that Plaintiff would be hired without either.

In addition, the argument that Plaintiff's interview was unduly delayed is also without merit, as Defendant conducted interviews from April to September of 2007.  (Pltf's Ex. 13).  At least one person submitted an application in November 17, 2006, and was not interviewed until June 20, 2007.  (Pltf's Ex. 13, Moberly application).  In light of this, his June 4, 2007 interview date is not so late as to constitute a difference.  Moreover, Plaintiff has made no argument nor shown any evidence that this alleged "difference" was of the sort that would dissuade a reasonable worker from engaging in protected activity, which, as discussed below, is a required element of a retaliation claim.

claim, it appears that Plaintiff wishes to proceed under both the direct and the indirect methods of proof.

Retaliation claims under the indirect method proceed in much the same manner as do discrimination claims.  A retaliation plaintiff must show that "(1) [he] engaged in statutorily protected activity; (2) [he] suffered a materially adverse action; (3) [he] met [his] employer's legitimate expectations…; and (4) [he] was treated less favorably than some similarly situated employee who did not engage in statutorily protected activity."   The definition of "materially adverse action" is somewhat different in the retaliation context, as the "plaintiff must show that…the challenged action…well might have dissuaded a reasonable worker from making or supporting a charge of discrimination;" it need not necessarily be an *employment-related* action such as termination.  Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006).  Once the plaintiff has carried this burden, the employer must produce a legitimate, non-retaliatory reason for the action, which the employee must then show to be pretextual.

The direct method, similarly to discrimination claims, requires proof that the plaintiff engaged in statutorily protected activity, that he suffered a materially adverse action (under the Burlington Northern standard), and that there is a causal connection between the two.  Hobbs v. City of Chicago, 573 F.3d 454, 463 (7th Cir. 2009) (citing Humphries v. CBOCS West, Inc., 474 F.3d 387, 404 (7th Cir. 2007)). Again, the plaintiff may use direct or circumstantial evidence to support his showing of a causal connection, though Plaintiff does not here have any direct evidence.

### A.      Indirect Method of Proof

As in discrimination cases, where the defendant has proffered a legitimate, non-retaliatory reason for its action against the plaintiff, the Court may proceed to analyze the plaintiff's showing that such a reason was pretextual.   Jordan v. Summers, 205 F.3d 337, 343 (7th Cir. 2000).

#### 1.      Failure to Hire

Here, Defendant has argued, *inter alia*, that Plaintiff was not rehired in 2007 because his mid-season resignation in 2005 had shown him to be unreliable.  As the Court noted above, Plaintiff has put on no evidence that this reason is pretextual. Therefore, for same the reasons given for its rejection of Plaintiff's discriminatory failure to hire claim under the indirect method, the Court rejects Plaintiff's claim of retaliatory failure to hire under the indirect method.

#### 2.      Different Selection Process

Plaintiff also argues that he was subjected to a different selection process from that of other applicants, in retaliation for his filing of charges against Defendant.  The specific difference of which Plaintiff complains is Wiggs' presence in the interview room with Onsrud, which he argues was designed to intimidate him.   In addressing the retaliation claim, in neither its Motion for Summary Judgment nor its Reply does Defendant directly submit a reason for its subjecting Plaintiff to a "different selection procedure."   However, in addressing Plaintiff's breach of contract claim, which also concerns Defendant's selection procedure, Defendant submits that Wiggs was in the interview room in order to assure compliance with the Settlement Agreement's requirements that the hiring process

be fair. (Doc. 70 at 7). Though this argument should have been addressed to the retaliation claim, as well, the Court will consider it as though it was, as Plaintiff has acquiesced in Defendant's submission of this reason in response to "different selection process" claim.[19]  Defendant's proffered reason is legitimate and non-retaliatory.[20]  As Defendant has proffered such a reason, the Court will proceed to discuss Plaintiff's efforts to prove that it is pretextual.[21]

In order to show pretext, Plaintiff must establish the existence of a genuine issue of material fact as to whether Defendant's given reason was a lie, not just that it was mistaken or wrongheaded. <u>Argyropoulos v. City of Alton</u>, 539 F.3d 724, 736

---

[19]  Plaintiff's Response at 16: "plaintiff concedes the Town has met its burden of production [as to the legitimate, non-discriminatory reason]. That is, according to the Town's Director of Parks & Recreation, Garry Little – and as substantiated by Doug Wiggs himself, Mr. Little directed Mr. Wiggs to attend the interview 'to make sure that the settlement agreement was followed.'" (Doc. 68 at 16 (quoting Little Dep. at 16)).

[20]  Plaintiff makes an argument that this explanation is not, in fact, non-retaliatory, as Wiggs' presence was required "for the sole purpose of helping to ensure that Plaintiff Graham would be less likely to file another charge." (Doc. 68 at 23). This argument is incredible. Under this theory, everything that employers do in an effort to comply with Title VII or other non-discrimination requirements after an employee has made a charge would open the employers up to retaliation claims, as they are ultimately designed to prevent further charges or lawsuits. Indeed, under this theory, Defendant would have been prohibited from *any* effort to comply with the Settlement Agreement, as such effort would be directed at keeping Plaintiff from filing a charge or lawsuit against it.

[21]  The Court notes that Plaintiff has not necessarily made out his prima facie case of retaliation as regards the "different selection procedures," as it is far from clear that an interview with an extra person, even one between whom and the plaintiff there is personal animosity, is the type of action that would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." Indeed, in <u>Burlington Northern</u>, the Supreme Court pointed out that the standard does not set a "general civility code for the American workplace," and that "personality conflicts" and "snubbing" are insufficient. 548 U.S. at 68 (citations omitted).

25

(7th Cir. 2008).  The only argument that Plaintiff makes against Defendant's given reason, that Wiggs was present in order to ensure compliance with the Settlement Agreement, is that the selection of Wiggs in particular was retaliatory.

Though Plaintiff questions the selection of Wiggs to monitor the interview in his effort to show that Defendant has not presented "objective evidence of a non-phony need to select the very individual known to have used the N-word toward Plaintiff," Plaintiff has identified the wrong standard.  Now that Defendant has come forward with its explanation, the burden is on Plaintiff to create a genuine issue of material fact that the explanation was untrue and that Wiggs' selection was retaliatory.  As Plaintiff himself notes, Defendant "is allowed to make a poor choice," so long as it was not retaliatory in intent.  Plaintiff argues that since Wiggs had been previously alleged to have used a racial slur in reference to him, Wiggs could only have been chosen in an effort to intimidate him.  As the Court discussed above in relation to Plaintiff's claim that Wiggs' selection was evidence of discrimination, though, Defendant only knew that Wiggs had been *alleged* to have made this statement, and that its Human Resources department report had been inconclusive on the issue.  Defendant was entitled to rely on the outcome of its report, and to continue to have Wiggs perform the functions that he otherwise would have performed.[22]  As Plaintiff has put on no evidence, but only his own

---

[22]    Plaintiff also makes much of the apparent factual dispute over whether Wiggs had questions to ask him at the interview.  (Doc. 68 at 17).  Even if Wiggs had a list of questions for Plaintiff, the Court cannot see how the mere intention to ask questions shows that Wiggs was not there in order to monitor the interview or that he was there in order to intimidate Plaintiff.  He did not have to be silent in order to monitor the interview, and questions are not *per se* intimidating.

perception that Wiggs was there to intimate him in retaliation, the Court finds that he has failed to make his case under the indirect method of proof.

## B.     Direct Method of Proof

A retaliation plaintiff may proceed under the direct method of proof by showing that he engaged in statutorily protected activity, that he suffered an adverse action by the employer that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination," and that there is a causal connection between the two.  The Seventh Circuit recognizes the same categories of circumstantial evidence under the direct method of proof for retaliation claims as for discrimination claims: "(1) suspicious timing, ambiguous statements, behavior towards other employees and so on; (2) evidence, but not necessarily rigorous statistical evidence, that similarly situated employees were treated differently, or (3) evidence that the…employer's reason for the difference in treatment is a pretext for discrimination."[23]  Volovsek, 344 F.3d at 689-90.  As noted above, on Plaintiff's retaliation claim, he asserts two separate adverse actions: Defendant's failure to hire him for 2007, and a different selection process from that experienced by other applicants.  These are considered in turn.

---

[23]     In Argyropoulos v. City of Alton, the Seventh Circuit noted that "employee's failure to cast doubt on an employer's nonretaliatory explanation will also doom a retaliation claim under the direct method."  539 F.3d at 736 fn. 6.  Therefore, it appears that it is unnecessary to analyze Plaintiff's claim of retaliation under the direct method, as he has failed to make a showing of pretext for either alleged adverse action under the indirect method.  However, in the interest of a thorough disposition, the Court will continue with the analysis under the direct method for both alleged adverse actions.

### 1.    Failure to Hire

Plaintiff has put on even less circumstantial evidence of retaliation in Defendant's failure to hire him in 2007 than he did for his claim of racial discrimination. The Plaintiff has shown no evidence that Onsrud had a retaliatory motive in deciding not to hire him, and his "cat's paw" theory alleges only *racial* motivation on the part of Wiggs and/or Little. As discussed above, Plaintiff also offers no evidence that Defendant's given reason for not hiring him in 2007 was pretextual. None of the evidence that Plaintiff puts on in support of his racial discrimination claim appears connected in any way to his filing of charges with the EEOC or his internal complaints of discrimination. Therefore, the Court finds that Plaintiff has not put on enough evidence to survive summary judgment on his retaliation claim for failure to hire under the direct method of proof.

### 2.    Different Selection Process

Plaintiff also argues that Defendant's use of a "different selection process" for him was an adverse action that was retaliatorily motivated. Plaintiff has presented some argument that the "different selection process" was adverse within the meaning of <u>Burlington Northern</u>, though the Court does not decide this issue.[24]

---

[24] As previously discussed, Plaintiff argues that Defendant's selection of Wiggs as the monitor for his interview was intimidating, as he had heard the allegation that Wiggs had used a racial slur in reference to him. He analogizes his situation to that of a female employee forced to undergo an interview with a superior who had previously sexually harassed her, arguing that this would clearly be adverse within <u>Burlington Northern</u>. Whether or not this is true, it is not a close comparison to Plaintiff's situation, as he does not assert that Wiggs racially harassed him, but only that Wiggs had allegedly used a racial slur in reference to Plaintiff, when Plaintiff was not around; harassment requires more than that. He further argues that Wiggs intended to ask him questions at the interview in order to intimidate him. The Court fails to see how asking questions at an interview is *per se*

Instead, the Court focuses on Plaintiff's lack of circumstantial evidence that the different process was motivated by a retaliatory reason. Plaintiff appears to rely on the latter two categories of circumstantial evidence: evidence that similarly situated employees did not have to undergo the "different selection process," and evidence that Defendant's given reason for the "different selection process" was pretextual. These two categories of evidence overlap with one another, and with the previous discussion under the indirect method of proof.

Plaintiff argues that no other employees had been in the past or were in 2007 required to undergo an interview with Wiggs present, which is not disputed by Defendant. However, Defendant has argued that Wiggs was present in order to ensure compliance with the Settlement Agreement, and, as discussed above, Plaintiff has put on no evidence that this reason is pretextual. The mere fact of a difference, without any other evidence or linkage to a retaliatory motive, is insufficient to establish the "convincing mosaic of circumstantial evidence" that is required. As noted above, the majority of Plaintiff's argument and evidence is directed toward showing that Defendant was motivated by racial animus, and he has neglected to make the required showing of *retaliatory* motive. Plaintiff has simply failed to establish any inkling of a causal connection between his protected activity and the fact that Wiggs was to be present at his scheduled interview. Therefore, Plaintiff has failed to show enough evidence to withstand summary judgment on his retaliation claim for "different selection procedure."

---

intimidating. However, whether the action was "adverse" does not need to be decided, as the evidence as to the causal connection is missing.

### III.   Count II: Breach of Contract

Both Plaintiff and Defendant have moved for Summary Judgment as to Plaintiff's breach of contract claim.  The Court has granted summary judgment in Defendant's favor on all of Plaintiff's federal claims.  Title 28 U.S.C. § 1367 provides that a district court "may decline to exercise supplemental jurisdiction" over pendent state-law claims if the court has dismissed all claims over which it has jurisdiction.  Wright v. Associated Ins. Co. Inc., 29 F.3d 1244, 1250 (7th Cir. 1994) (citing 28 U.S.C. § 1367(c)(3)).   A district court should consider and weigh the factors of judicial economy, convenience, fairness, and comity in deciding whether to exercise jurisdiction over pendent state-law claims.  Id. at 1251 (citing Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988)); Timm v. Mead Corp., 32 F.3d 273, 277 (7th Cir. 1994).

As a general rule, when all federal claims are disposed-of prior to trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits.[25]  Wright, 29 F.3d at 1250 (citing United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1996)).   The general rule is also applicable where, as here, the court has granted summary judgment on all the federal claims.  Kennedy v. Schoenberg, Fisher & Newman, Ltd., 140 F.3d 716, 727-28 (7th Cir. 1998).  Given this general rule, the Court here has determined that judicial economy and convenience both weigh in favor of relinquishing jurisdiction

---

[25]     An exception exists where the statute of limitations on the state law claim would preclude the plaintiff's re-filing in state court.  Wright, 29 F.3d at 1251. Illinois has a 10-year statute of limitations for actions on written contracts, so this exception is inapplicable.  735 ILCS 5/13-206.

over Plaintiff's breach of contract claim, as do fairness and comity.  It is better for

an Illinois state court to decide issues of anticipatory breach of contract under

Illinois law.  The Court therefore declines to retain jurisdiction over Plaintiff's state-

law breach of contract claim, finding that it would be better heard in the state

courts.[26]  Plaintiff's breach of contract claim is dismissed without prejudice.

### DEFENDANT'S MOTION TO STRIKE

Defendant has filed a Motion to Strike certain facts alleged in Plaintiff's

Additional Statement of Facts in his Memorandum in Response to Defendant's

Motion for Summary Judgment.   In addition, it moves to strike the audio file

attached as Exhibit 16 of Plaintiff's Response.  (Doc. 72).  Plaintiff has responded in

opposition to this Motion.  (Doc. 78).

It is true that the Federal Rules of Evidence apply at the summary judgment

stage, and that the Court may not consider evidence that is inadmissible.  Gunville

v. Walker, 583 F.3d 979, 985 (7th Cir. 2009) (collecting cases).  Defendant argues

that certain of Plaintiff's asserted facts are irrelevant, unduly prejudicial, or

---

[26]     Plaintiff addresses the so-called "no-brainer" exception to this general rule, arguing that it should preclude dismissal of his contract claim.  (Doc. 60 at 9 fn. 3). He cites to Van Harken v. City of Chicago, in which the Seventh Circuit held that "[i]f…an interpretation of state law that knocks out the plaintiff's state claim is obviously correct, the federal judge should put the plaintiff out of his misery then and there, rather than burdening the state courts with a frivolous case."  103 F.3d 1346, 1354 (7th Cir. 1997).  Further research shows that this "exception" applies only where it is clear that the plaintiff will lose its case in state court.  See, e.g., Golden Years Homestead, Inc. v. Buckland, 557 F.3d 457, 462 (7th Cir. 2009) (exception "applies when it is very clear that the supplemental claim is meritless"); Boyce v. Fernandes, 77 F.3d 946, 951 (7th Cir. 1996) ("if the supplemental claim is easily shown to have no possible merit, dismissing it on the merits is a time saver for everybody").  Even if it should apply to cases where the resolution in either direction is clear, the instant case would not be an appropriate application, as it is not patently obvious that either Plaintiff or Defendant should prevail.

hearsay.   In addition, it notes that some of the asserted "facts" are in fact arguments and characterizations of witness statements.   The Court agrees that certain of the facts are irrelevant and hearsay, and that some of them contain argument, which is improper for the statement of facts (this is true of Plaintiff's responses to Defendant's asserted facts, as well).   The Court will not *strike* these asserted facts as a group, though.   It is unnecessary and would be a waste of time for the Court to work through each of the facts to which Defendant objects, as many of them are ultimately irrelevant to the issues determining the Motions for Summary Judgment.   However, throughout this Order & Opinion, the Court has taken note of the inadmissibility of certain evidentiary material proffered by Plaintiff (including that some not objected to by Defendant), and has not considered such material in supporting its determination on the issue of summary judgment.[27] The Court, in its discretion, and in an effort at thoroughness, has considered the arguments made in Plaintiff's Additional Statement of Facts and in Plaintiff's responses to Defendant's Statement of Facts, though they should have been placed in the argument section.

Plaintiff's Exhibit 16 is a compact disc containing a recording of a voicemail message left by Plaintiff for Little after his scheduled interview.   Defendant argues that this exhibit should be stricken, as it was not produced by Plaintiff during discovery and is hearsay.   Plaintiff asserts that his attorney received the CD from

---

[27]   Examples include asserted facts that are not supported by the cited evidentiary material and hearsay.   The Court has simply not considered the facts asserted by both parties that are irrelevant to its determination of the Motion for Summary Judgment.

Defendant a few weeks after Plaintiff's scheduled interview and that there was therefore no need to produce it in discovery, and that the CD is a recording of Plaintiff's own statement, which is admissible.  The Court finds that there is no need to consider this debate.  It has listened to the CD, and finds that it contains no evidence that is relevant to any point at issue in determining these Motions for Summary Judgment.[28]  For the foregoing reasons, Defendant's Motion to Strike is denied.

CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (Doc. 61) is GRANTED IN PART and DENIED IN PART.  Summary judgment on Counts I and III of Plaintiff's Second Amended Complaint is GRANTED in favor of Defendant, and summary judgment on Count II of Plaintiff's Second Amended Complaint is DENIED.  Plaintiff's Motion for Partial Summary Judgment (Doc. 59) is DENIED.  Plaintiff's breach of contract claim, Count II of his Second Amended Complaint, is DISMISSED WITHOUT PREJUDICE.  Defendant's Motion to Strike (Doc. 72) is DENIED.

CASE TERMINATED.


Entered this 10th day of February, 2010.

s/ Joe B. McDade

JOE BILLY McDADE<br>United States District Judge

---

[28]    The voicemail message from Plaintiff notes that he left the scheduled interview because Wiggs was present, and that Defendant should call Plaintiff's attorney to reschedule the interview.  No part of the Court's decision turned on whether Plaintiff offered to reschedule the interview.